IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEVEN VUCHO,                    )
                                 )
        Plaintiff,               )
                                 )
    vs.                          )  Civil Action No. 11-1248
                                 )
MICHAEL J. ASTRUE,               )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )
        Defendant.               )

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff, Steven Vucho, seeks judicial review of a
decision of Defendant, Michael J. Astrue, Commissioner of Social
Security ("the Commissioner"), denying his applications for
disability insurance benefits ("DIB") and supplemental security
income ("SSI") under Titles II and XVI, respectively, of the
Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]
Presently before the Court are the parties' cross-motions for
summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons
set forth below, Plaintiff's motion for summary judgment will be
granted to the extent he seeks the remand of this case for

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system. With respect to Plaintiff's claim for DIB, his earnings record shows
that he has acquired sufficient quarters of coverage to remain insured
through September 30, 2008. (R. 18).

1

further consideration, and the Commissioner's cross-motion for summary judgment will be denied.

## PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on April 17, 2009, alleging disability since February 28, 2007 due to depression, Attention Deficit Hyperactivity Disorder ("ADHD"), lack of the ability to concentrate and a "bad back and neck." (R. 484-85, 486-88, 508). Following the denial of Plaintiff's applications, he requested a hearing before an administrative law judge ("ALJ"). (R. 37-40, 381-92, 393-404). Plaintiff, who was represented by counsel, testified at the hearing which was held on May 19, 2011. A vocational expert ("VE") also testified. (R. 939-72).

The ALJ issued a decision on June 17, 2011, denying Plaintiff's applications for DIB and SSI based on a determination that, despite his physical and mental impairments, Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2] (R. 18-35). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on September 13, 2011. (R. 9-11). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

---

[2] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a).

2

**DISABILITY HEARING**

Plaintiff's testimony during the hearing before the ALJ on May 19, 2011, may be summarized as follows:

Plaintiff was born on January 8, 1965.[3] He is single and resides with his sister and her boyfriend. Plaintiff's education ended in the 10th grade. He attempted to obtain a General Equivalency Diploma ("GED"); however, he was not successful. Plaintiff can write his name but he has difficulty reading. Plaintiff also has problems with basic math skills. Plaintiff had a driver's license; however, it was suspended in 1996 in connection with a charge of driving under the influence ("DUI"). (R. 943-45). From 1984 to 2007, Plaintiff worked as a laborer for a landscaping company.[4] (R. 967).

Plaintiff underwent surgeries on his cervical and lumbar spines in 2008 and 2009. Plaintiff has been unable to work since February 2007 due to radiating pain throughout his body, particularly in his low back, hips and "whole spinal cord." (R. 945-46). Plaintiff suffers from severe pain on a daily basis which interferes with his ability to concentrate.[5] Plaintiff's family physician, Dr. Nicassio, prescribes Vicodin to control

---

[3] Plaintiff was 46 years old on the date of his disability hearing.

[4] The Court notes that, contrary to this testimony, there is evidence in the administrative record that Plaintiff held a variety of jobs between 1984 and 2007, including jobs in a gas station, in restaurants, in a Community Mart and with the Pennysaver newspaper. (R. 609, 721).

[5] Plaintiff rated his daily pain an 8 on a scale of 1 (lowest) to 10 (highest), and, at times, a 10. (R. 949).

3

his pain.[6]   (R. 948-51, 964-65).   Plaintiff also suffers from
depression and anxiety.   However, he was not being treated for
these conditions at the time of the hearing.   (R. 954-55).

Plaintiff described a typical day as follows:

"... I wake up. Go to the bathroom. Eat my breakfast. Go
for a walk if I can, if I feel good enough to go for a walk
in the neighborhood. Come back. Take a nap or something.
And wake up. Move around a little bit more. Watch a
little bit of TV. Maybe go for another walk. Come back.
And take a nap again. And it's basically the same pattern
every day...."

(R. 956-57).

Plaintiff also does puzzles, talks to his friends on the

telephone and visits his friends twice a week.   (R. 957).

Plaintiff has a history of drug and alcohol abuse which ended in

1996.   He completed a rehabilitation program and continued to

attend AA meetings.   (R. 958-62).

## VOCATIONAL EXPERT

The ALJ asked the VE to assume a person of Plaintiff's age,

education and past work history who can perform work at the

light exertion level with the following restrictions:[7] (1) the

job cannot involve more than occasional balancing, stooping,

kneeling, crouching, crawling and climbing; (2) the job must

---

[6] Vicodin is used to relieve moderate to severe pain.  It is in a class of
medications called opiate (narcotic) analgesics.  www.nlm.nih.gov/
medlineplus/druginfo ("MedlinePlus").

[7] The Social Security Regulations define "light" work as involving "lifting no
more than 20 pounds at a time with frequent lifting and carrying of objects
weighing up to 10 pounds.  Even though the weight lifted may be very little,
a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).

4

provide a sit/stand option during the work day; (3) the job must

not involve exposure to temperature extremes; (4) the job must

involve no more than minimal written instructions and little or

no math computation skills; (5) the job must involve no more

than simple, routine, repetitive work (only 1 or 2-step

instructions) with no production rate; (6) the job must involve

little or no changes in the work setting; and (7) the job must

require no more than limited contact with the general public,

coworkers and supervisors. The ALJ then asked the VE whether

the hypothetical person could perform Plaintiff's past work or

any other work. The VE testified that the person could not

perform Plaintiff's past work as a laborer for a landscaping

company but could perform the jobs of a sorter, a marker and a

small products assembler. (R. 968-69). If the hypothetical

person was limited to sedentary work,[8] rather than light work,

the VE testified he could perform the jobs of a sorter and a

surveillance system monitor. (R. 970).

If the hypothetical person was off task 10% of the day or

absent from work more than 2 days a month due to his impairments

and pain, the VE testified that he would not be able to work.

Similarly, if the hypothetical person was markedly limited in

---

[8] The Social Security Regulations define "sedentary" work as involving "lifting
no more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers, and small tools. Although a sedentary
job is defined as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties." 20 C.F.R.
§§ 404.1567(a), 416.967(a).

5

his ability to get along with coworkers and supervisors or in social functioning due to drug and alcohol abuse, the VE testified that he would not be able to work. (R. 970-71).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

The evidence in the administrative record relating to Plaintiff's mental impairments may be summarized as follows:[9]

## Evidence pertaining to Mental Impairments Preceding the Alleged Onset Date of Disability

On October 9, 2000, Dr. Richard Sanders of Allegheny East MH/MR Center performed a psychiatric evaluation of Plaintiff based on a referral by his friends. Plaintiff, who had been released from jail 8 weeks earlier, reported chronic depression, irritability, insomnia and difficulties adjusting to his then present life circumstances. Plaintiff had resumed working in the family business (a gas station); he was living with his parents; and he had conflicted emotions when encountering his children and estranged spouse. Plaintiff's chief complaints were irritability when around others and despair when alone. He denied violence towards people but admitted recently kicking a cabinet drawer at work out of frustration. Plaintiff reported

---

[9] The arguments in Plaintiff's brief in support of his motion for summary judgment are limited to his mental impairments. Therefore, the Court's summary of the evidence in the administrative record will be so limited. In this connection, the Court notes that although Plaintiff has not abandoned his claim of significant limitations due to pain, he concedes that a reasonable person could have reached the same conclusion as the ALJ concerning the limiting effects of his physical impairments. (Docket No. 12, p. 3, n.5). The Court also notes that evidence of Plaintiff's mental impairments which significantly precede his alleged onset date of disability has been included in the summary for background purposes.

6

sleeping "quite poorly" and occasional suicidal thoughts. He

also reported a history of situational anxiety with somatic

manifestations including chest pain. Plaintiff reported that he

attended special education classes in school; was a disciplinary

problem; and engaged in substance abuse throughout much of his

scholastic career. Dr. Sanders diagnosed Plaintiff with "Major

Depressive Episode, Single, Moderate, with depressed mood,

insomnia, suicidal thoughts, subjective difficulty

concentrating, frequent decreased energy, and weight loss; Rule

out Dysthymic Disorder; and Learning Disorder NOS." Dr. Sanders

rated Plaintiff's score on the Global Assessment of Functioning

("GAF") scale a 45 and his highest score during the previous

year a 55.[10] Dr. Sanders recommended anti-anxiety medication and

instructed Plaintiff to schedule a follow-up week in 4 weeks.

(R. 596-98).

On October 29, 2001, Plaintiff underwent a consultative

psychological evaluation by Dr. Robert J. Lanz, Jr. Plaintiff

---

[10] The GAF scale is used by clinicians to report an individual's overall level
of functioning. The scale does not evaluate impairments caused by physical
or environmental factors. The GAF scale considers psychological, social and
occupational functioning on a hypothetical continuum of mental health to
mental illness. The highest possible score is 100, and the lowest is 1. A
GAF score between 41 and 50 denotes: "**Serious symptoms** (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) **OR any serious
impairment in social, occupational, or school functioning** (e.g., no friends,
unable to keep a job)." A GAF score between 51 and 60 denotes: "**Moderate
symptoms** (e.g., flat affect and circumstantial speech, occasional panic
attacks) **OR moderate difficulty in social, occupational, or school
functioning** (e.g., few friends, conflicts with peers or co-workers)."
American Psychiatric Association: Diagnostic and Statistical Manual of Mental
Disorders, Fourth Edition, Text Revision (2000), at 34 (bold face in
original) ("DSM-IV-TR").

7

reported that he had been separated from his common law wife with whom he had 5 children for 3 years; he had been seeing a therapist and a psychiatrist at Allegheny East MH/MR Center on a regular basis since his release from jail for aggravated assault by vehicle; he has a history of alcohol abuse but had been sober for over 3 years and attended AA meetings once a week; he had used marijuana for many years but not recently; and he took Diazepam and Risperdal (to slow down his thoughts) on a daily basis.[11] With respect to Plaintiff's mental status examination, Dr. Lanz noted that Plaintiff's eye contact and thought productivity were adequate; he was cooperative and reasonably spoken; his affect was appropriate; he was "quite verbal" that day; he usually responded to questions in a comprehensible manner; and he was oriented to time, place and person. Dr. Lanz also noted that Plaintiff's interview was compatible with the diagnoses assigned to Plaintiff by the psychiatrist at Allegheny East MH/MR Center. (R. 608-13).

Following his interview of Plaintiff, Dr. Lanz completed a medical assessment of Plaintiff's ability to perform work-related mental activities. With respect to making occupational

[11] Diazepam is used to relieve anxiety, muscle spasms and seizures and to control agitation caused by alcohol withdrawal. Risperdal is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). It is also used to treat episodes of mania (frenzied, abnormally excited, or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in people with bipolar disorder (manic depressive disorder, a disease that causes episodes of depression, episodes of mania, and other abnormal moods). MedlinePlus.

8

adjustments, Dr. Lanz opined that Plaintiff's ability to deal with the public was *good*; his abilities to relate to co-workers, interact with supervisors and deal with work stresses were *good or less*; and his abilities to follow work rules, use judgment, function independently and maintain attention/concentration were *fair*.[12] As to making performance adjustments, Dr. Lanz opined that Plaintiff's ability to understand, remember and carry out simple job instructions was *good or less*, and his ability to understand, remember and carry out detailed or complex job instructions was *fair*.[13] Finally, regarding the ability to make personal-social adjustments, Dr. Lanz opined that Plaintiff's ability to demonstrate reliability was *good*; his abilities to maintain personal appearance and relate predictably in social situations were *good or less*; and his ability to behave in an emotionally stable manner was *fair*. (R. 614-16).

On December 20, 2002, Dr. Leo Bastiaens, a psychiatrist at Allegheny East MH/MR Center, performed a psychiatric evaluation of Plaintiff. His report indicates that Plaintiff previously was treated at Allegheny East MH/MR Center between 2000 and 2001, and that Plaintiff had been prescribed several mood stabilizers with very poor compliance and no effectiveness.

---

[12] For purposes of the medical assessment, "good" meant the ability to function in an area was limited but satisfactory and "fair" meant the ability to function in an area was seriously limited, but not precluded. (R. 614).
[13] In this connection, Dr. Lanz noted that Plaintiff had difficulty following directions during his interview. (R. 615).

9

Plaintiff reported being "obsessed" with his ex-wife which was manifested by jealousy, mild anxiety with tremors and some nausea, and angry moments leading to mild property destruction (such as kicking a door). Plaintiff also reported that he had used marijuana, cocaine, speed and LSD heavily in the past, but had not experienced psychotic symptoms or serious withdrawal from these substances; he had a long history of excessive alcohol use resulting in several DUI convictions and a motor vehicle accident; and he was not drinking heavily at that time. Dr. Bastiaens noted that Plaintiff displayed no evidence of depressive disorder, mania, panic disorder, social phobia, obsessive compulsive disorder, psychosis or an eating disorder, and he denied episodes of euphoria, decreased need for sleep or grandiosity. Dr. Bastiaens also noted: "The patient certainly may have problems in social, occupational and familial areas related to his impulsivity. However, it does not appear that the patient is impaired in terms of initiating and maintaining work." Dr. Bastiaens rated Plaintiff's GAF score between 55 and 60. (R. 617-19).

**Evidence of Mental Health Treatment Following the Alleged Onset Date of Disability**

On June 25, 2007, Stephen Perconte, Ph.D., performed a psychological evaluation of Plaintiff at the request of the Pennsylvania Bureau of Disability Determination. As to

Plaintiff's mental status during the evaluation, Dr. Perconte noted that he appeared sickly; he was somewhat disheveled; his grooming was marginal, but his hygiene appeared adequate; he had on an excessive amount of cologne which Dr. Perconte suspected was used to cover-up the odor of alcohol; his orientation appeared marginal; he did not appear to fully understand the purpose of the evaluation; he was slow and evasive in responding to questions which suggested possible intoxication; he was lethargic, guarded, defensive, detached and appeared drowsy throughout the evaluation; his eye contact was good; his speech was normal in volume and tone, but extremely slow in rhythm and rate; his speech content was overproductive and tangential; his mood appeared dysphoric and irritable with a restricted and incongruent affect; his thought processes appeared somewhat illogical, vague and significantly slow, possibly due to intoxication; and his insight and judgment appeared to be poor. Dr. Perconte's diagnoses included alcohol dependence, narcotic dependence, alcohol induced mood disorder and antisocial personality disorder, and he rated Plaintiff's score on the GAF scale as follows: "GAF current equal 60, highest equal 65 to 70,[14] lowest equal 50." (R. 720-30).

---

[14] A GAF score between 61 and 70 denotes: "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful personal relationships.**" DSM-IV-TR.

11

In connection with the psychological evaluation, Dr. Perconte completed a questionnaire regarding Plaintiff's ability to perform work-related mental activities. Dr. Perconte opined that Plaintiff was: (1) *slightly* impaired in his ability to understand, remember and carry out short, simple instructions; (2) *moderately* impaired in his ability to understand, remember and carry out detailed instructions; (3) *moderately* impaired in making judgments on simple work-related decisions; (4) *moderately* limited in his ability to interact with the public, supervisors and co-workers; (5) *moderately* limited in his ability to respond to work pressures in a usual work setting; and (6) *moderately* limited in his ability to respond appropriately to changes in a routine work setting. (R. 731-32).

On August 15, 2007, Douglas Schiller, Ph.D., a non-examining State agency psychological consultant, completed a Mental RFC Assessment in which he rendered the opinion that Plaintiff was *not significantly* limited in the following areas: (1) remember locations and work-like procedures; (2) understand, remember and carry out very short and simple instructions; (3) work in coordination with or proximity to others without being distracted by them; and (4) travel in unfamiliar places or use public transportation. In the following areas, Dr. Schiller opined that Plaintiff was *moderately* limited: (1) understand,

12

remember and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) make simple work-related decisions; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the public; (8) ask simple questions or request assistance; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (12) respond appropriately to changes in the work setting; (13) be aware of normal hazards and take appropriate precautions; and (14) set realistic goals or make plans independently of others. (R. 345-47).

Dr. Schiller also completed a Psychiatric Review Technique form for Plaintiff on August 15, 2007, in which he rendered the opinion that Plaintiff was *moderately* restricted in his activities of daily living and had *moderate* difficulties in maintaining social functioning, concentration, persistence or

13

pace. Dr. Schiller also rendered the opinion that there was insufficient evidence of repeated episodes of decompensation, each of an extended duration. (R. 348-61).

On March 31, 2009, Tarsha Lagrone, a non-licensed clinician with Milestone Center,[15] performed an initial assessment of Plaintiff. As to his mental health history, Plaintiff reported anxiety, bipolar disorder, depression, emotional abuse and panic attacks. Plaintiff also reported a history of substance abuse, including marijuana, cocaine and alcohol. With regard to her assessment of Plaintiff's mental status, Ms. Lagrone indicated that he was distractible and unable to concentrate with a broad affect; he had poor insight and judgment and made poor life decisions; he was dramatic and impulsive; his content and form of thought, general appearance, intellect/abstract thought, memory, mood, motor activity, orientation, perceptions, sensorium consciousness and speech were normal; he had no potential for violence; he reported an anxious mood; and he denied suicidal/homicidal ideation. Ms. Lagrone's diagnoses included (1) bipolar I disorder, most recent episode mixed, moderate and (2) alcohol dependence (by history in remission). Ms. Lagrone rated Plaintiff's GAF score a 50 and the range of

---

[15] Milestone Center is the successor of Allegheny East MH/MR Center. (R. 812).

his GAF scores in the previous year between 30 and 50.[16]  (R.
733-47).

On July 8, 2009, Scott Kaper, Ph.D., performed a
psychological evaluation of Plaintiff at the request of the
Pennsylvania Bureau of Disability Determination.  Dr. Kaper
noted that Plaintiff was highly agitated throughout the
appointment and openly confrontational at times.  Dr. Kaper also
noted that it was difficult to get "an exact picture" of
Plaintiff's alleged conditions, but it was clear that he had
been in a depressed state for some time with persistent low
mood, ruminating guilt, trouble sleeping, anhedonia, increased
anxiety, low energy, variable appetite and low self-esteem.
Although Plaintiff exhibited paranoid thoughts at times, Dr.
Kaper indicated that overall, his thoughts were logical, linear
and within normal limits.  Dr. Kaper also indicated that
Plaintiff's responses to his questions were coherent, logical
and without loose associations; his capacity for abstract
thinking was poor; he did not complete any of 4 basic arithmetic
problems; his intelligence was judged to be below average, if
not near the borderline range; overall, his working memory was
"likely compromised," although it might not be for the kinds of

---

[16] A GAF score of 30 denotes the following: "**Behavior is considerably
influenced by delusions or hallucinations OR serious impairment in
communication or judgment** (e.g., sometimes incoherent, acts grossly
inappropriately, suicidal preoccupation) **OR inability to functions in almost
all areas** (e.g., stays in bed all day; no job, home, or friends)."  DSM-IV-
TR.

jobs he held in the past; his attention span was "just below average" for his age; he "likely" has poor insight into his psychological functioning; and he has a limited social network. Dr. Kaper's diagnoses included (1) major depressive disorder, recurrent, moderate; (2) cannabis abuse; (3) alcohol dependency by history; and (4) rule out intermittent explosive disorder, learning disorder (mathematics), bipolar disorder, ADHD, anxiety disorder and borderline intellectual functioning. Dr. Kaper rated Plaintiff's GAF score a 50. (R. 810-17).

Three days after his evaluation of Plaintiff, Dr. Kaper completed a question concerning Plaintiff's work-related mental impairments. Dr. Kaper opined that Plaintiff was limited in his ability to understand, remember and carry out instructions but he did not indicate the extent of the limitation, i.e., *slight, moderate, marked or extreme*. Dr. Kaper also opined that Plaintiff was *moderately* limited with regard to the ability to interact appropriately with supervisors, and that he was *markedly* limited in the following areas: (1) to interact appropriately with the public and co-workers; (2) to respond appropriately to work pressures in a usual work setting; and (3) to respond appropriately to changes in a routine work setting. (R. 818-19).

On August 28, 2009, during an office visit with his family physician, Dr. Nicassio, Plaintiff complained of difficulty

16

sleeping, stress and depression. Dr. Nicassio noted that
Plaintiff was seeing a psychiatrist, and that Plaintiff wanted
medication for his depression. Dr. Nicassio prescribed Lexapro,
Trazodone and Ambien for Plaintiff,[17] and he instructed Plaintiff
to continue his mental health treatment. (R. 863).

On September 9, 2009, Dr. Perconte performed another
consultative psychological examination of Plaintiff at the
request of the Pennsylvania Department of Disability
Determination. As to current mental health treatment, Dr.
Perconte noted that Plaintiff was "extremely vague," reporting
only that he had last seen his counselor at Milestone Center a
month earlier. Plaintiff informed Dr. Perconte that he was
taking Trazodone and 2 other medications whose names he could
not remember. With respect to Plaintiff's mental status
examination, Dr. Perconte noted that his clothing was
appropriate but somewhat disheveled; his hygiene appeared
adequate, although his grooming was neglected; he was alert and
responsive, but somewhat restless and at times hypomanic; he was
extremely resistant and generally uncooperative, often refusing
to cooperate with test instructions; his eye contact was fair
but his engagement during the examination was poor; his speech
was loud in volume and tone, but relatively normal in rhythm and

---

[17] Lexapro is used to treat depression and generalized anxiety disorder;
Trazodone is used to treat depression; and Ambien is used to treat insomnia.
MedlinePlus.

17

rate; his speech content was spontaneous but generally
tangential and, at times, poorly directable; the coherence of
his speech was adequate although his verbal fluency was below
average; his mood was irritable and resistant; and it was not
clear whether he had used drugs or alcohol the day of the
examination. Dr. Perconte administered the Wechsler Adult
Intelligence Scale test to Plaintiff. His scores in the
following areas fell within the classification of "mild mental
retardation": verbal comprehension, working memory, processing
speed and full-scale IQ. With respect to perceptual reasoning,
Plaintiff's score fell within the classification of "borderline
intellectual functioning." However, Dr. Perconte stated that
the legitimacy of Plaintiff's test scores was "highly
questionable and possibly invalid," noting that "... the
claimant was generally uncooperative and resistant throughout
testing and his motivation was generally oppositional and poor."
In Dr. Perconte's opinion, Plaintiff's true IQ score probably
falls within the borderline intellectual functioning range. Dr.
Perconte stated that Plaintiff's testing suggested *mild* to
*moderate* impairment in his ability to understand, retain and
follow instructions and sustain attention to perform simple
repetitive tasks.[18]  Dr. Perconte described Plaintiff's prognosis

---

[18] Dr. Perconte noted that the IQ test did not address Plaintiff's ability to
relate to others or his ability to tolerate stress.  (R. 838).

18

as "guarded." Dr. Perconte rated Plaintiff's GAF score at the time of the evaluation a 55, and his highest and lowest GAF scores during the previous year a 65 and a 50. (R. 832-40).

In a questionnaire completed the day of his evaluation of Plaintiff, Dr. Perconte opined that Plaintiff was *slightly* limited in his ability to understand, remember and carry out short, simple instructions; *moderately* limited in his ability to (1) understand, remember and carry out detailed instructions; (2) make judgments on simple work-related decisions; (3) interact with the public; (4) respond appropriately to work pressures in the usual work setting; and (5) respond appropriately to changes in a routine work setting; and *markedly* limited in his ability to interact appropriately with supervisors and co-workers. (R. 829-31).

On October 7, 2009, Arlene Rattan, Ph.D., a non-examining State agency psychological consultant, completed a Mental RFC Assessment for Plaintiff. In various abilities relating to Understanding and Memory, Sustained Concentration and Persistence, Social Interaction and Adaptation, Dr. Rattan opined that Plaintiff was *not significantly* limited or *moderately* limited. (R. 842-45). In a Psychiatric Review Technique form completed the same day, Dr. Rattan opined that Plaintiff was *mildly* restricted in activities of daily living; he had *moderate* difficulties in maintaining social functioning,

19

concentration, persistence and pace; and he had never had an
episode of decompensation of an extended duration. (R. 846-58).

**ALJ'S DECISION**

In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months. See 42
U.S.C. § 423(d)(1). A claimant is considered unable to engage
in any substantial gainful activity only if his physical or
mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ
must follow a sequential evaluation process. See 20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4). The process was described by
the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as
follows:

\* \* \*

Pursuant to his statutory authority to implement the
SSI Program, (footnote omitted) the Secretary has
promulgated regulations creating a five-step test to

determine whether an *adult* claimant is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work.  See 20 C.F.R. §§ 416.920(a) through (c)(1989).  In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989).  If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry.  § 416.920(d).  If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps.  At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience.  If the claimant cannot do his past work or other work, he qualifies for benefits.

\*    \*    \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process for making disability determinations.  At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy in light of his or her RFC.  Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found

that Plaintiff had not engaged in substantial gainful activity
since February 28, 2007, the alleged onset date of disability,
and the medical evidence established that Plaintiff suffers from
the following severe impairments: degenerative disc disease of
the lumbar and cervical spines status post fusion surgeries;
coagulation disorder with recurrent pulmonary emboli; borderline
intellectual functioning; antisocial personality disorder; and
depressive disorder. (R. 20).

Turning to step three, the ALJ found that Plaintiff's
impairments were not sufficiently severe to meet or equal the
requirements of any impairment listed in 20 C.F.R., Pt. 404,
Subpt. P, App. 1, and, in particular, Listing 1.00 relating to
the musculoskeletal system, Listing 4.00 relating to the
cardiovascular system and Listing 12.00 relating to mental
disorders. (R. 21-26).

Before proceeding to step four, the ALJ rendered the
following assessment of Plaintiff's RFC:

\*    \*    \*

**5.   After careful consideration of the entire record, the
undersigned finds that the claimant has the [RFC] to lift
10 pounds frequently and 20 pounds occasionally but can
only carry 2-3 pounds frequently and 10 pounds
occasionally.   He is allowed to alternate sitting and
standing.  He should never bend but can balance, stoop,
kneel, crouch, crawl and climb occasionally.  He should
avoid constant repetitive operation of hand or foot
controls and concentrated exposure to extremes in
temperature.  In addition, due to significantly impaired
computational skills and cognitive difficulties, he is**

22

**limited to jobs that require no more than the most basic math skills and minimal written instructions. In addition, because of psychological problems affecting concentration, memory, and ability to handle stress, he is only capable of performing simple, routine, repetitive work, involving one or two-step instructions at non-production rate pace, and requiring little independent decision making, little or no changes in the work setting, and only limited contact with the general public, co-workers, and supervisors.**

\* \* \*

(R. 27).

The ALJ then proceeded to step four, finding that Plaintiff is unable to perform his past relevant work. (R. 33).

Finally, at step five, considering Plaintiff's age, education, work experience, RFC and the VE's testimony, the ALJ found that Plaintiff could perform a range of sedentary work existing in significant numbers in the national economy, including the jobs of a sorter and a surveillance systems monitor. (R. 34-35).

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court

23

would have decided the case differently, it must accord

deference to the Commissioner and affirm the findings and

decision if supported by substantial evidence. Monsour Medical

Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

With respect to mental impairments, Social Security Ruling

85-15 provides in relevant part:[19]

... The basic mental demands of competitive, remunerative,
unskilled work include the abilities (on a sustained basis)
to understand, carry out, and remember simple instructions;
to respond appropriately to supervision, coworkers, and
usual work situations; and to deal with changes in a
routine work setting. A substantial loss of ability to
meet any of these basic work-related activities would
severely limit the potential occupational base. This, in
turn, would justify a finding of disability because even
favorable age, education, or work experience will not
offset such a severely limited occupational base.

As noted in the summary of the evidence, both consultative

examiners rendered the opinion that Plaintiff's mental

impairments result in *marked* limitations. Dr. Kaper opined that

Plaintiff was *markedly* limited in, among other work-related

abilities, the ability to interact appropriately with the public

and coworkers. Dr. Kaper explained the reason for the foregoing

opinion as follows:

Claimant was agitated through much of the interview, at
times directly challenging this clinician w[ith] great
indignation & hostility. He reported that his emotions tend

---

[19] Social Security Rulings are agency rulings published "under the authority of
the Commissioner of Social Security" and "are binding on all components of
the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d
Cir.2000).

24

> to run unchecked in this way ..., though he might respond
> over time to authority figures if he began to trust them.
> He would likely respond to change [and] basic pressure at
> work by projecting blame onto others, or challenging them
> in the way he did this clinician.

(R. 818).

Similarly, Dr. Perconte opined that Plaintiff was *markedly*

limited in his ability to interact appropriately with

supervisors and co-workers. Dr. Perconte's explanation for this

opinion included Plaintiff's anti-social personality disorder

which the ALJ recognized as one of Plaintiff's severe

impairments. (R. 20, 830).

If the *marked* limitations cited by Drs. Kaper and Perconte

were accepted, Plaintiff's potential occupational base would be

severely limited and a finding of disability justified in

accordance with Social Security Ruling 85-15.[20] However, the ALJ

rejected the opinions of Drs. Kaper and Perconte regarding

Plaintiff's *marked* limitations. Instead, the ALJ gave

substantial weight to the opinion of Dr. Rattan, the non-

examining State agency psychological consultant, who rendered

the opinion that Plaintiff was only *moderately* limited his

abilities to interact with the public, respond appropriately to

criticism from supervisors and get along with co-workers. (R.

843).

---

[20] The Court notes that during Plaintiff's disability hearing, the VE
specifically testified that a person who was *markedly* limited in the ability
to get along with coworkers and supervisors would not be able to work. (R.
970-71).

Turning first to Dr. Kaper, the ALJ rejected his opinion regarding Plaintiff's *marked* limitations because "they are based on the claimant's agitated, hostile and non-cooperative behavior during the interview." (R. 25). Plaintiff argues that it was "illogical ... for the ALJ to reject assessed limitations stemming from an antisocial personality disorder on the basis that the claimant actually exhibited the characteristic behaviors of the impairment." (R. 14). After consideration, the Court agrees.

Antisocial personality disorder is a type of chronic mental illness in which a person's way of thinking, perceiving situations and relating to others are abnormal – and destructive. People with antisocial personality disorder typically have no regard for right and wrong. They may often violate the law and the rights of others, landing in frequent trouble or conflict. They may lie, behave violently, and have drug and alcohol problems. People with antisocial personality disorder may not be able to fulfill responsibilities to family, work or school. www.mayoclinic.com/health/antisocial-personality-disorder.

As noted by Plaintiff, the foregoing description of antisocial personality disorder is consistent with Plaintiff's behavior during the consultative evaluation performed by Dr. Kaper. Specifically, Dr. Kaper noted that Plaintiff had been

separated from his common law wife for 14 years; he was "highly
agitated," "openly confrontational" and "hostile" throughout the
evaluation; he reported multiple DUIs, incarceration for 7
years, and periods of "road rage;" his thoughts, at times, were
indicative of paranoia; he was preoccupied with being treated
fairly; he displayed poor insight into his psychological
functioning and projected his difficulties onto others; he had a
limited social network; he reported frustration with his family
because they would not "take him back;" and, by Plaintiff's own
admission, his presentation during the evaluation – hostile,
confrontational, guarded - was typical of how he deals with
people.[21]  (R. 810-17).  Under the circumstances, the ALJ's
stated reason for rejecting Dr. Kaper's opinion was erroneous.

The Court also concludes that the ALJ's stated reasons for
rejecting the Dr. Perconte's opinion that Plaintiff was *markedly*
limited in his ability to interact appropriately with coworkers
and supervisors were erroneous.  First, the ALJ rejected Dr.

---

[21] Plaintiff's presentation during his evaluation by Dr. Perconte September 9,
2009 was similar.  Dr. Perconte noted that Plaintiff was "extremely
resistant" and "generally uncooperative;" his speech was "loud in volume and
tone;" his mood was "irritable;" his motivation during IQ testing was
"generally oppositional and poor;" he voiced his opinion that testing "proved
nothing;" he "deliberately sabotaged" the IQ test; and he reported multiple
arrests for DUIs.  (R. 832-40).  Dr. Perconte also noted: "... the claimant
has been previously examined by the undersigned for psychological evaluation
....  Results of that evaluation indicated a clear history of polysubstance
dependence and alcohol dependence, with the suggestion of possible substance-
induced mood disorder and clear indications of oppositional defiant disorder
and conduct disorder suggesting current antisocial personality disorder."
(R. 837).

Perconte's opinion because the doctor purportedly acknowledged in his report that the IQ test he administered to Plaintiff did not address Plaintiff's ability to relate to others. (R. 24). While Dr. Perconte's report does state that the IQ test did not address Plaintiff's capacity to relate to others, it is clear that Dr. Perconte's psychological evaluation of Plaintiff was not limited to IQ testing. Dr. Perconte described the reason for Plaintiff's referral for evaluation as follows:

> To provide the Bureau of Disability Determination an independent assessment of the Disability applicant, diagnosis of any conditions revealed, and objective data to help determine the effects such conditions will have on the applicant's ability to perform work-related activities.

(R. 833).

In addition, it is clear from his report that Dr. Perconte conducted a mental status examination of Plaintiff. Accordingly, the ALJ's first stated reason for rejecting Dr. Perconte's opinion regarding the severity of Plaintiff's limitation in interacting appropriately with supervisors and coworkers is unfounded.

Second, the ALJ rejected Dr. Perconte's opinion because the doctor acknowledged that Plaintiff's alcohol and substance use at that time was unknown. (R. 24). However, the report of Dr. Perconte's psychological evaluation of Plaintiff clearly shows that his diagnosis of Plaintiff with antisocial personality disorder was not dependent on Plaintiff's drug and alcohol

abuse. It was an entirely separate diagnosis that was well supported by his mental status examinations of Plaintiff in both 2007 and 2009. Accordingly, the uncertainty concerning Plaintiff's drug and alcohol abuse provides no support for the rejection of Dr. Perconte's opinion that Plaintiff is *markedly* limited in the ability to interact appropriately with supervisors and coworkers.

**CONCLUSION**

Based on the foregoing, this case will be remanded to the Commissioner for further consideration of the opinions rendered by the consultative psychological evaluators concerning Plaintiff's ability to interact appropriately with supervisors and coworkers *on a sustained basis*.

*William L. Standish*

William L. Standish
United States District Judge

Date: September 27, 2012